**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION No. 25-cv-01321-CYC

MICHAEL RYAN TATUM, an individual; CALYX CONTAINERS, LLC, a Colorado limited liability company, CHAZ HERMANOWSKI, an individual, and JACOB TORRISON, an individual,

      Plaintiffs,

v.

KINZIE ADVANCED POLYMERS LLC d/b/a GROVE BAGS, an Ohio limited liability company.

      Defendant.

---

**VERIFIED FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

COME NOW, Plaintiffs Michael Ryan Tatum ("Tatum"), Calyx Containers, LLC ("Calyx"), Chaz Hermanowski ("Hermanowski"), and Jacob Torrison ("Torrison") (collectively "Plaintiffs"), by and through their counsel, 3i Law, LLC, and for their Verified First Amended Complaint state as follows:

## 1.    PARTIES, JURISDICTION, AND VENUE

1.    Tatum is an individual residing at 5147 Chicory Circle, Brighton, Colorado.

2.    Calyx is a Colorado limited liability company with a principal office located at 392 Mill Creek Cir., Vail, Colorado.

3.    Hermanowski is an individual residing at 5415 Flower Court, Arvada Colorado.

4.    Torrison is an individual residing at 4460 E. 121st Court, Thornton, Colorado.

**EXHIBIT 2**

5.      Defendant, Kinzie Advanced Polymers LLC d/b/a Grove Bags ("Defendant"), is an Ohio limited liability company with a registered agent located at 5 Lake House Lane, City of Hunting Valley, State of Ohio.

6.      On or about February 1, 2023, Defendant and Tatum entered into an agreement for the employment of Tatum ("Tatum Employment Agreement"), attached and referenced herein as **Exhibit 1**.

7.      On or about January 1, 2022, Defendant and Hermanowksi entered into an agreement for the employment of Hermanowksi ("Hermanowksi Employment Agreement"), attached and referenced herein as **Exhibit 2**.

8.      On or about January 1, 2022, Defendant and Torrison entered into an agreement for the employment of Torrison ("Torrison Employment Agreement"), attached and referenced herein as **Exhibit 3**.

9.      This is a civil action between five parties.  Each party is a citizen of a different state. The amount in controversy of this Complaint exceeds $75,000.00.  As such, Plaintiffs invoke the jurisdiction of the court pursuant to Article III § 2 of the U.S. Constitution, 28 U.S.C. § 1332.

10.     Venue is fair and proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this state, and because Plaintiffs are citizens of the state of Colorado and Tatum, Hermanowski, and Torrison entered into their respective Employment Agreements in the state of Colorado, and performed under the Employment Agreements in the state of Colorado.  Additionally, C.R.S. § 8-2-113(6) prohibits covenants not to compete from requiring a worker who primarily resided or worked in Colorado to adjudicate the enforceability of the covenant outside of Colorado.  Colorado Revised Statute §

**EXHIBIT 2**

8-2-113(7) further authorizes a worker or prospective employer to seek a declaratory judgment in a court of competent jurisdiction in Colorado as to the unenforceability of such a covenant.

11.     Defendant knew Plaintiffs Tatum, Hermanowski, and Torrison were Colorado residents at the time of hire and expressly acknowledged Tatum's and Torrison's residence in Colorado in their respective Employment Agreements.[1]   *See* Exh. 1, Tatum Employment Agreement, ¶ 1; Exh. 3, Torrison Employment, ¶ 1.

12.     Although the Employment Agreements at issue contain a forum-selection clause designating a different jurisdiction, venue in the State of Colorado is proper because enforcing that clause would contravene Colorado's strong public policy.  Colorado has a significant connection to the parties and the dispute, and courts may decline to enforce a forum-selection clause where doing so would violate the forum state's fundamental public policy.  *See Morris v. Towers Fin. Corp.*, 916 P.2d 678, 682 (Colo. App. 1996) (refusing to enforce a forum-selection clause designating New York where it conflicted with Colorado's public policy under the Colorado Wage Claim Act).

## GENERAL ALLEGATIONS RELATED TO TATUM AND CALYX

13.     At all times relevant, Tatum was a resident of the State of Colorado.

14.     At all times relevant, Calyx was a Colorado limited liability company.

15.     Defendant is a packaging manufacturing company specializing in a variety of industries.

---

[11] At all times relevant, Hermanowski was a resident of the state of Colorado.  At the time he signed the Hermanowski Employment Agreement, he was between leases on two properties in Colorado and so had Defendant use Hermanowski's parents' address in Florida.  *See* Exh. 2, Hermanowski Employment Agreement, ¶ 1.

3

**EXHIBIT 2**

16.     Tatum initially worked for Defendant as an independent contractor, beginning in 2020.

17.     Upon the conclusion of his independent contractor relationship approximately three months later, Tatum was hired by Defendant as a full-time employee.

18.     At the time he commenced his employment with Defendant, Tatum executed a written employment agreement.

19.     In or about January 2023, Tatum received a raise. Defendant subsequently presented Tatum with the Tatum Employment Agreement, which replaced the prior employment agreement(s) previously executed between the parties.

20.     When presenting the Tatum Employment Agreement, Defendant informed Tatum that signing was required to retain his pay raise, and that refusal to sign would result in a reduction in pay.

21.     Defendant did not provide Tatum with a separate notice of the restrictive covenants contained in the Tatum Employment Agreement, nor was Tatum given the required 14 days' advance notice, or any notice at all.

22.     On February 1, 2023, Tatum signed the Tatum Employment Agreement at Defendant's insistence, without knowledge of his rights under Colorado law and without any opportunity to consult legal counsel or conduct research regarding those rights.

23.     The Tatum Employment Agreement contains a covenant not to compete which states:

> While employed by the Company and for a period of two (2) years
> immediately following the voluntary or involuntary termination of
> Employee's employment with the Company for any reason,
> Employee will not, in the United States or Canada, either directly or

4

indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

Exh. 1, Tatum Employment Agreement, § 6(a).

24.    The Tatum Employment Agreement contains a non-solicitation provision, which

states:

While employed by the company and for a period of two (2) years immediately following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, either directly or indirectly solicit, contact, induce, or attempt to induce the Company's current or prospective contractors, clients, customers, suppliers, vendors, licensees, licensors, franchisees, franchisors, or any persons or entities with business relations with the Company to cease doing business with the Company, or in any way interfere with the relationship between any such current or prospective contractors, clients, customers, suppliers, vendors, licensees, licensors, franchisees, franchisors, or business relation with the Company.

Exh. 1, Tatum Employment Agreement, § 6(b).

25.    The Tatum Employment Agreement also includes a choice-of-law and forum-selection clause that purports to require the application of Ohio law and mandates that any disputes arising from the agreement be resolved exclusively in an Ohio forum. Exh. 1, Tatum Employment Agreement, § 16.

26.    Tatum was employed by Defendant as its Chief Commercial Officer from February 1, 2023, through August 24, 2023.

**EXHIBIT 2**

27.     On or about August 24, 2023, Defendant terminated Tatum's employment.

28.     Following his termination in August 2023, Tatum was compelled to accept lower-skilled employment unrelated to his area of expertise, as any position utilizing his professional skills would have risked violating the restrictive covenants contained in the Tatum Employment Agreement.

29.     In October 2023, Tatum learned that Calyx, a cannabis packaging company, had expanded its capabilities to include label and flex pack printing as well as corrugated box manufacturing.  At the time, Tatum was working with a client who was actively seeking those specific services.

30.     Calyx approached Tatum in February 2024 and presented him with verbal offer to come work for them.

31.     Believing he was bound by the terms of the restrictive covenants set forth in his Tatum Employment Agreement, Tatum informed Calyx he was unable to join the company.

32.     Calyx approached Tatum again in March 2024, offering him a position as Director of Sales and Marketing with a projected on-target earnings ("OTE") salary of $240,000–$260,000 per year.

33.     Again, Tatum declined the offer based on his belief in the enforcement of the restrictive covenants set forth in his Tatum Employment Agreement.

34.     After Tatum declined the position for a second time, both Tatum and Calyx began evaluating the enforceability of the restrictive covenants contained in the Tatum Employment Agreement.

35.     Following their investigation, Tatum and Calyx discovered that Colorado law disfavors restrictive covenants and that the provisions contained in the Tatum Employment Agreement are unenforceable under applicable state law.

36.     After making this determination, but erring on the side of caution, Tatum accepted a lesser role with Calyx as an independent contractor rather than an employee in September 2024, pending further clarity regarding the enforceability of the restrictive covenants.

37.     As a consultant for Calyx, Tatum is compensated at a rate of $45 per hour, which will result in average annual earnings of approximately $93,000-$105,000.

38.     Approximately one month after beginning as a consultant with Calyx, on or about October 29, 2024, Defendant filed an action in the United States District Court, Northern District of Ohio, case number 1:24-cv-01887 ("Ohio Action"), against Calyx and Tatum attempting to enforce the restrictive covenants contained in the Tatum Employment Agreement.

**2022 Revisions to Colorado's Restrictive Covenant Statute**

39.     In 2022, Colorado significantly reformed the state's non-competition statute, codified at C.R.S. § 8-2-113.  These changes went into effect on August 10, 2022.

40.     Under the revised statute, non-competition and non-solicitation agreements are generally void unless certain specific conditions are met.  *See* C.R.S. § 8-2-113(2)(a) ("Except as provided in subsection (2)(b) and (3) of this section, any covenant not to compete that restricts the right of any person to receive compensation for performance of labor for any employer is void.").

41.     Under the revised statute, a non-compete or non-solicitation agreement is only enforceable if the worker qualifies as a "highly compensated worker," as  such threshold is determined by the Colorado Department of Labor and Employment, both at the time the agreement

7

**EXHIBIT 2**

is entered into and at the time it is enforced; the agreement is for the protection of trade secrets; and the restriction is no broader than reasonably necessary to protect the employer's legitimate interest in protecting trade secrets.  C.R.S. § 8-2-113(2)(b); C.R.S. § 8-2-113(2)(d).

42.    The statute further provides that any non-compete agreement that is otherwise permissible under C.R.S. § 8-2-113(2) or (3) is void unless notice of the restrictive covenant is provided to:

      (I)  A prospective worker before the worker accepts the employer's offer of employment; or

      (II)  A current work at least fourteen days before the earlier of:

            (A)  The effective date of the covenant; or

            (B)  The effective date of any additional compensation or change in the terms or conditions of employment that provides consideration for the covenant.

C.R.S. § 8-2-113(4)(a).

43.    The notice must be contained "in a separate document from any other covenants between the worker and employer and in clear and conspicuous terms in the language in which the worker and employer communicate about the worker's performance." C.R.S. § 8-2-113(4)(b).

44.    "The notice must be signed by the worker." *Id.*

45.    A non-compete agreement "that applies to a worker who, at the time of termination of employment, primarily resided or worked in Colorado may not require the worker to adjudicate the enforceability of the covenant outside of Colorado." C.R.S. § 8-2-113(6).

46.    "Notwithstanding any contractual provision to the contrary, Colorado law governs the enforceability of a covenant not to compete for a worker who, at the time of termination of employment, primarily resided and worked in Colorado." *Id.*

47.     "A worker who is a party to a covenant not to compete, or a subsequent employer that has hired or is considering hiring the worker, may seek a declaratory judgment from a court of competent jurisdiction or an arbitrator that the covenant not to compete is unenforceable." C.R.S. § 8-2-113(7).

48.     "An employer shall not enter into, present to a worker or prospective worker as a term of employment, or attempt to enforce any covenant that is void" under C.R.S. § 8-2-113. C.R.S. § 8-2-113(8)(a).

49.     Colorado law provides limited exceptions to the general prohibition on restrictive covenants, including provisions related to the repayment of certain training or educational expenses, reasonable confidentiality agreements, covenants tied to the sale of a business, and scholarship repayment requirements in apprenticeship programs. *See* C.R.S. § 8-2-113(3).

### Defendant's Violations of C.R.S. § 8-2-113

50.     At the time Defendant sought to enforce Tatum's covenant not to compete, Tatum was not a highly compensated individual, as required under C.R.S. § 8-2-113(2)(b) and as further defined under C.R.S. § 8-2-113(2)(c); Tatum was earning between $93,000-$105,000.

51.     In 2024, the Colorado Department of Labor and Employment ("CDLE") specified annualized cash compensation required to be considered a highly compensated individual was $123,750. *See* **Colo. Dep't of Lab. & Emp.,** *INFO #1: Key Wage and Hour Rights and Responsibilities in Colorado: the COMPS and PAY CALC Orders* 5 at p.4 (Dec. 8, 2023), https://cdle.colorado.gov/infos.[2]

_____

[2] Under C.R.E. 201(b)(2), the Court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," such as official government publications.

**EXHIBIT 2**

52.     At the time Defendant presented Tatum with the Tatum Employment Agreement, Tatum was a current employee.  Accordingly, Defendant was required to provide Tatum with the terms of the covenant not to compete at least 14 days before the earlier of: (A) the effective date of the covenant; or (B) the effective date of any additional compensation or change in the terms or conditions of employment that provides consideration for the covenant.  *See* C.R.S. § 8-2-113 (4)(a)(II).

53.     Additionally, Defendant was required to provide the requisite notice in a separate document from any other covenants between Tatum and Defendant and in "clear and conspicuous terms in the language in which the worker and employer communicate about the worker's performance." *Id.* at §§ 4(b).

54.     The notice must be signed by the worker. *Id.*

55.     Defendant failed to provide separate notice of the covenant not to compete 14 days prior to the effective date of his additional compensation or change in the terms and conditions of his employment.  Instead, Tatum was told if he did not execute the Tatum Employment Agreement that day, he would be receive an immediate reduction in pay.

56.     Because Defendant provided Tatum with no notice of the non-compete agreement whatsoever, there is no notice signed by Tatum, as required under C.R.S. § 8-2-113(4)(b).

57.     Defendant presented the non-compete provision contained in the Tatum Employment Agreement as a mandatory condition of employment, demanding Tatum's immediate acceptance under threat of pay reduction.  Defendant's use of a non-compete provision that is void under C.R.S. § 8-2-113 as a condition of employment constitutes a violation of C.R.S. § 8-2-113(8)(a).

58.     Defendant's initiation of the Ohio Action to enforce the void non-compete agreement constitutes a further violation of C.R.S. § 8-2-113(8)(a), which expressly prohibits an employer from attempting to enforce any covenant that is void under C.R.S. § 8-2-113.

59.     Defendant continues to pursue the Ohio Action, which if permitted to continue would violate the public policy interests of the State of Colorado because Defendant is attempting to enforce an unlawful contract provision.

60.     At the time of the Tatum Employment Agreement, no statutory exception to C.R.S. § 8-2-113(2)(a) applied to Tatum.

61.     Upon information and belief, Defendant initiated and continues to prosecute the Ohio Action not for the purpose of obtaining a lawful adjudication of rights under the Tatum Employment Agreement.

62.     Rather, Defendant's actions appear intended to exert pressure on both Tatum and Calyx by using the litigation process as a tool to discourage Tatum from continuing in any professional capacity and to deter Calyx from employing him in any role.

63.     Defendant filed the Ohio Action despite having reason to know that the restrictive covenants it sought to enforce were void and unenforceable under Colorado law, including that Tatum was not a highly compensated worker and had not received the statutory notice required under C.R.S. § 8-2-113.

64.     As a result of Defendant's conduct, Calyx's business operations have been disrupted, and its ability to make independent hiring decisions has been impaired.

65.     The Ohio Action has also placed Tatum in the position of having to defend against out-of-state litigation based on an invalid covenant, solely for accepting a consulting engagement with a Colorado-based company.

### GENERAL ALLEGATIONS RELATED TO HERMANOWSKI

66.     Plaintiff Hermanowski began working for Defendant in August 2019 as its fourth employee, during a time when the Company was still struggling to meet payroll.

67.     Reflecting his long-term commitment to building the brand, Hermanowski accepted a lower base salary in exchange for equity potential and executed his first employment agreement with Defendant in or around September 2019.

68.     From August 2019 through January 1, 2022, Hermanowski served as Defendant's Rocky Mountain Sales Manager.  He handled business development and sales across the region, while also performing duties in marketing, HR, and operations due to Defendant's lean team.

69.     Effective January 1, 2022, Defendant promoted Hermanowski to Director of Marketing, increasing his salary to $90,000 and later placing him under the direct supervision of the Company's new Chief Marketing Officer ("CMO").

70.     In connection with this promotion, CEO Jack Grover ("Mr. Grover") offered to rescind Hermanowski's previously granted equity interest in exchange for a higher base salary and performance-based incentives.  However, Mr. Grover implied that accepting the offer would signal a lack of commitment to the Company and reflect poorly on Hermanowski's loyalty.  As a result, Hermanowski declined and retained both his equity and the originally proposed salary.

71.     In connection with the promotion, Hermanowski signed a new employment agreement in January 2022 (the "Hermanowski Employment Agreement"), which included

12

**EXHIBIT 2**

identical restrictive covenants to the Tatum Employment Agreement, fully set forth in paragraphs 24 and 25 herein. *See* Exh. 1, §§ 6(a)-(b); Exh. 2, §§ 6(a)-(b).

72.    The Hermanowski Employment Agreement also contained an identical forum selection clause to the Tatum Employment Agreement. *Id.* at § 16.

73.    Throughout his three-year tenure, Hermanowski consistently performed at a high level and was never subject to any performance improvement plan. In the months leading up to his separation, he received regular praise from the CMO and was entrusted with onboarding new marketing personnel, reflecting the Company's continued confidence in his abilities.

74.    On August 30, 2022, Mr. Grover placed a meeting on Hermanowski's calendar for the following day. Believing the meeting would involve a performance review or promotion, based on recent successes and milestone achievements, Hermanowski prepared a detailed performance overview in advance.

75.    On August 31, 2022, Hermanowski attended the meeting and was blindsided to learn that Defendant had determined he was no longer a "cultural fit." He was told there was no longer a place for him with Defendant and was given a severance agreement that he had fewer than 24 hours to review and sign.

76.    Hermanowski was advised that if he did not sign the agreement by the next day, he would be terminated without severance and that the Company would inform others that he had been fired.

77.    Despite diligently seeking legal advice within the limited timeframe, Hermanowski was only able to consult briefly with a family friend in the legal profession, who proposed modest

revisions to narrow the scope of the noncompete. Defendant summarily rejected all proposed changes and refused to extend the review period.

78. Under pressure and without the benefit of meaningful legal review, Hermanowski signed the severance agreement on September 2, 2022.

79. Although the agreement was dated September 2, Defendant unilaterally backdated the effective date to August 31, seemingly to avoid continuing Hermanowski's health insurance coverage through the month of September.

80. The severance agreement reaffirmed the restrictive covenants from the Hermanowski Employment Agreement without modification.

81. Defendant failed to provide separate notice of the restrictive covenants in accordance with C.R.S. § 8-2-113(4).

82. Following his separation, Hermanowski attended a cannabis industry trade show in October 2022 to explore new opportunities in public relations, marketing, and ancillary cannabis services, fields in which he had built his career.

83. Shortly after the trade show, Hermanowski received a cease-and-desist letter from Defendant's legal counsel asserting the restrictive covenants remained fully enforceable. The letter demanded that Hermanowski disclose all individuals and companies he had communicated with since his separation, identify any information he had shared concerning Defendant, and confirm that he would remain compliant with all restrictive covenants going forward.

84. At the time Defendant sought to enforce the restrictive covenants in October 2022, Hermanowski was not employed and therefore did not meet the salary threshold required to qualify as a "highly compensated worker" under C.R.S. § 8-2-113(2)(d). As of that date, Hermanowski

was not receiving any compensation from Defendant or any other employer and thus did not meet the statutory criteria for lawful enforcement of either a noncompete or non-solicitation provision.

85. In addition to being unenforceable due to Hermanowski's compensation status at the time of enforcement, the restrictive covenant itself was facially overbroad. It prohibited Plaintiff from working for any competitor of Defendant in any capacity throughout the United States and Canada for two years following his separation.

86. This broad restriction would have prevented Plaintiff from working in any meaningful role in his industry, regardless of job function or geographic location, and effectively barred him from continuing his career.

87. In order to respond, Hermanowski was forced to retain legal counsel using his severance funds. Unable to sustain the cost of legal representation, and facing ongoing pressure from Defendant's legal team, Hermanowski ultimately acquiesced to the Company's interpretation of the covenants.

88. As a direct result of Defendant' threats and attempted enforcement of the restrictive covenants, after August 10, 2022, when amendments to C.R.S. § 8-2-113 took effect, Hermanowski withdrew from two promising employment opportunities within the cannabis industry: one with Grasslands (a cannabis public relations and marketing firm) and one with Fish Head Farms (a cannabis-focused nutrient sales company).

89. Hermanowski did not receive a formal offer from either company due to the chilling effect of Defendant's legal actions, which made clear that Defendant would treat any employment within the broader cannabis sector as a breach of the restrictive covenants.

90. At the time of his termination, Hermanowski had recently entered into a new lease on a higher-priced residence, an arrangement encouraged by Defendant's leadership to support his role stability.

91. Following his exit, Hermanowski learned that Defendant's CEO made disparaging comments about him to mutual contacts within the industry, further damaging his professional reputation.

92. Losing both his job and the brand he helped build caused Hermanowski significant emotional distress, including stress, frustration, and a loss of professional identity. He experienced embarrassment, uncertainty about his future, and financial strain as a result of Defendant's actions and the ongoing enforcement of the restrictive covenants by Defendant continued to compound this harm long after his termination.

93. Defendant's cease-and-desist letter, sent to Hermanowski in October 2022, marked the first express threat of enforcement under the restrictive covenants contained in his employment and severance agreements.

94. Following the letter, Defendant continued to assert the validity and enforceability of the noncompete and non-solicitation provisions for the full duration of the two-year restrictive period following Hermanowski's separation.

95. Defendant's continued assertion of those restrictions created an ongoing chilling effect that deterred Hermanowski from pursuing multiple opportunities within the cannabis industry, his field of established expertise.

96.     As a result, the injury suffered by Hermanowski was not a one-time event but continued throughout the duration of the purported restriction, which remained in effect through at least September 2, 2024.

97.     Accordingly, Hermanowski's claims are timely under the continuing harm doctrine, as Defendant's enforcement actions imposed a sustained restraint on his employment opportunities and professional advancement.

## GENERAL ALLEGATIONS RELATED TO TORRISON

95.     Torrison began working for Defendant in December 2020 and was later promoted to Central Sales Manager effective January 1, 2022.  At the time of his promotion, Torrison signed a new employment agreement providing a $60,000 annual salary and commission compensation based on sales performance ("Torrison Employment Agreement").

96.     The Torrison Employment Agreement contained included identical restrictive covenants to the Tatum and Hermanowski Employment Agreements.  *See* Exh. 1, §§ 6(a)-(b); Exh. 2, §§ 6(a)-(b); Exh. 3, §§ 6(a)-(b).

97.     The Torrison Employment Agreement also contained an identical forum selection clause to the Tatum and Hermanowski Employment Agreements.  *Id.* at § 16.

98.     Throughout his employment, Torrison consistently met performance expectations and received no formal discipline, performance counseling, or written warnings.

99.     On March 31, 2023, Torrison attended a cannabis/hemp industry convention where he promoted Defendant's alleged proprietary packaging product, Terploc.  The conference took place in a municipality with heightened regulatory scrutiny around medical cannabis packaging,

where compliance with intellectual property and labeling claims was critical to product approval and consumer trust.

100.    In the course of that event, multiple prospective customers asked Torrison to provide proof of a patent for the Terploc product, which Defendant had directed employees to market and represent as patented.

101.    Torrison had not been provided with any documentation verifying that Terploc was, in fact, patented, and became concerned that continuing to make such representations without proof could violate intellectual property, consumer protection, or marketing laws.

102.    Upon returning from the conference, Torrison raised the issue directly with Defendant's management, requesting verification or documentation of the patent status before continuing to represent the product as patented.

103.    Torrison became concerned that continuing to market the product as patented, without verification, could create exposure or liability for both himself and Defendant, particularly given the scrutiny in the regulated cannabis market.

104.    Within 24 hours of raising this concern, Defendant abruptly presented Torrison with a severance agreement and gave him less than eight hours to review and return it.  When Torrison did not sign, he was informed via email on April 7, 2023, that he was being terminated for cause.

105.    Shortly after his termination, Torrison accepted an offer of employment with DIZPOT, a packaging company headquartered in Arizona.  He signed the offer on October 20, 2023, and began onboarding and training in early November 2023.

106.    On November 9, 2023, during the course of Torrison's training, DIZPOT executives informed him that Defendant had contacted the company, asserted that Torrison remained subject to a noncompete agreement, and implied legal consequences if he remained employed.

107.    That same day, DIZPOT terminated Torrison's employment.  Torrison was forced to fly home immediately and abandon a role that offered a base salary of $80,000.  Defendant's interference deprived Torrison of this opportunity and caused significant financial harm.

108.    At the time Defendant attempted to enforce the alleged noncompete in November 2023, Torrison did not meet the salary threshold required to qualify as a "highly compensated worker" under C.R.S. § 8-2-113(2)(b).  Torrison's base salary at DIZPOT was $80,000, well below the $112,500 threshold established by the Colorado Department of Labor and Employment for 2023.

109.    Even if the restrictive covenant Defendant attempted to enforce were otherwise valid, it was sweeping in scope.  It barred Torrison from working for any competitor of Defendant in any capacity, anywhere in the United States or Canada, for a full year following his separation.

110.    The breadth of this restriction would have prevented Torrison from taking on any meaningful role in his field, regardless of function, location, or employer, effectively excluding him from the entire industry.

111.    Defendant's actions directly interfered with Torrison's employment contract with DIZPOT and destroyed a valid and valuable economic opportunity.

112.     Following his termination and Defendant's interference with subsequent employment, Torrison suffered severe financial instability.  He was forced to rely on his spouse to return to full-time work in order to maintain health insurance and housing stability.

113.     As a result of Defendant's conduct, Torrison experienced emotional distress, anxiety, and loss of professional identity.  Fearing reputational harm, Torrison refrained from seeking further employment in his field.

## DEFENDANT'S ABUSE OF PROCESS AGAINST HERMANOWSKI AND TORRISON

114.     On June 10, 2025, Defendant filed a lawsuit against Plaintiffs Hermanowski and Torrison in the U.S. District Court for the Northern District of Ohio ("Second Ohio Action").

115.     The Second Ohio Action seeks declaratory relief affirming the validity of the Hermanowski Employment Agreement and his severance agreement, and of the Torrison Employment Agreement, as well as asserting claims for breach of contract.

116.     It contains no factual allegations connecting either plaintiff to any specific conduct that would plausibly support those claims, relying instead on bare, conclusory assertions.

117.     Defendant filed the Second Ohio Action shortly after learning Hermanowski and Torrison intended to join the present lawsuit in Colorado.

118.     Both Hermanowski and Torrison reside and worked exclusively in Colorado, and the claims they assert in this case concern the enforceability of noncompete provisions governed by Colorado law.

119.     Although their employment agreements contain Ohio forum selection clauses, those clauses are unenforceable in this context because Defendant's claims arise from the same

employment relationships and implicate restrictive covenants that must be litigated under Colorado law. *See* C.R.S. § 8-2-113(6).

120.    Defendant's attempt to reframe its Ohio complaint as unrelated to noncompete enforcement is a transparent effort to sidestep Colorado's public policy and statutory protections.

121.    Rather than pursue a legitimate legal dispute, Defendant used the filing to retaliate against Hermanowski and Torrison for asserting their legal rights and to deter them from participating in this litigation.

122.    Defendant used the legal process not to seek redress, but to impose cost, fear, and delay; this conduct constitutes an abuse of process.

123.    The Second Ohio Action is the latest in a pattern of legal threats and filings aimed at suppressing former employees who challenge the enforceability of restrictive covenants.

124.    Defendant has now turned those tactics toward Hermanowski and Torrison, using the court system as a weapon in direct response to their protected activity.

125.    The harm to Hermanowski and Torrison includes the cost of defending a meritless action, the burden of litigating in a distant forum, and the chilling of their rights under Colorado law.

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment that Restrictive Covenants are Void and Unenforceable – C.R.S. § 8-2-113 and § 13-51-105; 28 U.S.C. § 2201 / Fed. R. Civ. P. 57)**

126.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 125 above.

127.    An actual and justiciable controversy exists between Plaintiffs and Defendant concerning the enforceability of the restrictive covenants contained in the Tatum Employment

**EXHIBIT 2**

Agreement with Defendant, including but not limited to provisions purporting to restrict Plaintiff's right to engage in lawful employment following his termination.

128.   Pursuant to C.R.S. § 8-2-113(2)(a), any covenant not to compete that restricts the right of a person to receive compensation for the performance of labor for any employer is void unless it satisfies the exceptions outlined in the statute.

129.   Tatum was not a "highly compensated worker" at the time Defendant attempted to enforce it.  Tatum's compensation fell below the threshold set forth by the Colorado Department of Labor and Employment for 2024, as required under C.R.S. § 8-2-113(2)(b) and (c).  *See Colo. Dep't of Lab. & Emp., INFO #1*, *supra* ¶ 50.

130.   Additionally, Defendant failed to comply with C.R.S. § 8-2-113(4), which requires that employers provide notice of a restrictive covenant to a current employee at least 14 days in advance, in a separate document, using clear and conspicuous language, and signed by the worker. No such notice was provided to Tatum.

131.   The restrictive covenants are not protected by any of the limited statutory exceptions outlined in C.R.S. § 8-2-113(3).

132.   Defendant's presentation of the void non-compete as a condition of employment, and its subsequent attempt to enforce that agreement in an out-of-state forum, violates C.R.S. § 8-2-113(8)(a), which prohibits employers from entering into or attempting to enforce a covenant that is void under the statute.

133.   Colorado Revised Statute § 8-2-113(6) prohibits employers from requiring workers who primarily resided or worked in Colorado to adjudicate the enforceability of a non-compete agreement outside of Colorado.  Defendant's initiation and continued prosecution of the Ohio

**EXHIBIT 2**

Action is a direct violation of this statutory protection and contrary to Colorado's strong public policy interest in shielding its workers from unenforceable restrictive covenants.

134.    Tatum and Calyx are entitled under C.R.S. § 8-2-113(7) to seek a declaratory judgment from this Court that the restrictive covenants are void and unenforceable.

135.    This Court is further authorized to issue declaratory relief under C.R.S. § 13-51-105, which empowers courts of record to declare the rights, status, and legal relationships of parties, regardless of whether additional relief is sought.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in his favor and against Defendant, and issue a declaration that:

1.      The restrictive covenants contained in the Tatum Employment Agreement, including the non-compete and non-solicitation provisions, are void and unenforceable under Colorado law;

2.      Colorado law governs the enforceability of the restrictive covenants pursuant to C.R.S. § 8-2-113(6), regardless of any choice-of-law or forum-selection clause in the Tatum Employment Agreement;

3.      Defendant is prohibited from enforcing or attempting to enforce the restrictive covenants against Tatum;

4.      Any litigation concerning the enforceability of the restrictive covenants must occur in a court of competent jurisdiction in the State of Colorado;

5.      Defendant must cease all efforts to prosecute or maintain the Ohio Action or any other action seeking to enforce the restrictive covenants outside of Colorado; and

6.      Such other and further relief as the Court deems just and proper, including an award of costs and attorneys' fees as permitted by law

Plaintiffs further requests the Court set this matter for an evidentiary hearing or oral argument on the requested declaratory relief at the Court's earliest convenience, pursuant to Fed. R. Civ. P. 57, so that the controversy regarding the enforceability of the restrictive covenants may be promptly resolved.

## SECOND CLAIM FOR RELIEF
### (Violation of C.R.S. § 8-2-113 / Tatum v. Defendant)

136.    Tatum incorporates by reference the allegations set forth in Paragraphs 1 through 135 as if fully set forth herein.

137.    An employer is prohibited from entering into, presenting to a worker as a term of employment, or attempting to enforce any covenant not to compete that is void under the statute. C.R.S. § 8-2-113(8)(a).

138.    Defendant violated C.R.S. § 8-2-113(8)(a) by presenting Tatum with a void restrictive covenant as a mandatory condition of employment, without the required statutory notice, and under threat of immediate reduction in pay.

139.    Defendant further violated C.R.S. § 8-2-113(8)(a) by initiating the Ohio Action and continuing to pursue enforcement of the void non-compete provision, in direct contravention of the statute and Colorado public policy.

140.    Any worker harmed by such conduct may bring an action for injunctive relief, actual damages, a statutory penalty of $5,000 per violation, and reasonable attorneys' fees and costs.  C.R.S. § 8-2-113(8)(b).

141.    Tatum has suffered financial harm as a result of Defendant's unlawful conduct, including lost earning potential, professional disruption, and the burden of defending against an out-of-state lawsuit enforcing void contractual provisions.

WHEREFORE, Plaintiff Tatum respectfully requests that the Court enter judgment in his favor and against Defendant, and award a permanent injunction enjoining Defendant from prosecuting or maintaining the Ohio Action or otherwise attempting to enforce the restrictive covenants contained in the Tatum Employment Agreement, damages in an amount to be determined at trial, statutory penalties, attorney's fees and costs, pre- and post-judgment interest, and any such other and further relief as the Court deems just and proper.  Plaintiff Tatum also reserves the right to seek a temporary restraining order or preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.

### Third Claim for Relief
### (Abuse of Process / All Plaintiffs v. Defendant)

142.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 141 as if fully set forth herein.

143.    Defendant initiated and continues to prosecute the Ohio Action against Plaintiffs Tatum and Calyx, including claims seeking to enforce restrictive covenants that are facially void under Colorado law and inapplicable to Plaintiff Tatum's post-employment activities.

144.    Upon information and belief, Defendant initiated and maintained the Ohio Action not to obtain a lawful adjudication of rights, but to create economic and professional pressure on Plaintiffs by burdening them with costly litigation and casting a cloud over Tatum's ability to work in the industry.

**EXHIBIT 2**

145. Defendant initiated the Second Ohio Action against Plaintiffs Hermanowski and Torrison, asserting claims arising from their employment and severance agreements while avoiding direct enforcement of the restrictive covenants in an apparent effort to circumvent Colorado law and deter them from pursuing their rights in this forum.

146. Defendant's use of legal process, including filing and continuing to pursue claims it knew or should have known were unenforceable under Colorado law, was undertaken to deter Plaintiff Tatum from pursuing lawful employment and to chill lawful competition, rather than to obtain a legitimate judicial remedy.

147. Such conduct reflects a willful use of legal proceedings for an ulterior purpose, namely to interfere with Plaintiffs' employment relationships, damage their reputations, and extract leverage in ongoing disputes unrelated to the claims asserted in the Ohio Action and the Second Ohio Action.

148. As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered harm including reputational injury, emotional distress, lost employment opportunities, loss of income, and the incurrence of litigation-related expenses.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, and award damages in an amount to be determined at trial, attorneys' fees and costs associated with defending the Ohio Action and the Second Ohio Action, punitive damages to the extent permitted by law, pre- and post-judgment interest, and any further relief this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
**(Breach of the Duty of Good Faith and Fair Dealing / Tatum v. Defendant)**

149.    Tatum incorporates by reference the allegations set forth in Paragraphs 1 through 148 as if fully set forth herein.

150.    Tatum and Defendant were parties to a valid and enforceable employment agreement, the Tatum Employment Agreement, which governed the terms and conditions of Tatum's employment, including his compensation, duties, and post-employment obligations.

151.    Under Colorado law, every contract includes an implied covenant of good faith and fair dealing, which requires that neither party engage in conduct that prevents the other from receiving the benefits of the agreement.

152.    Defendant exercised its discretion under the Tatum Employment Agreement in a manner inconsistent with good faith and fair dealing, thereby depriving Tatum of the reasonably expected benefits of the contract.

153.    Specifically, Defendant acted in bad faith by:

   a.   Presenting Tatum with the Tatum Employment Agreement, and conditioning his previously increased salary on immediate execution of the agreement, without prior notice or opportunity to review the restrictive covenants as required under C.R.S. § 8-2-113;

   b.   Failing to provide the separate, signed notice required by law before imposing restrictive covenants that would substantially limit Tatum's future employment options;

   c.   Terminating Tatum's employment without cause on August 24, 2023;

**EXHIBIT 2**

    d.   Presenting Tatum with a severance agreement after his termination that reaffirmed the same restrictive covenants, again without providing requisite notice of restrictive covenants required under C.R.S. § 8-2-113;

    e.   Providing Tatum with an initial demand for immediate signature, followed by only 24 hours to sign the severance agreement after he raised objections, creating significant economic pressure and depriving him of a reasonable opportunity to seek legal advice or understand his rights under Colorado law;

    f.   Relying on the restrictive covenants in both the employment and severance agreements to interfere with Tatum's ability to pursue work in his area of expertise, and to justify the filing of out-of-state litigation intended to chill lawful employment activity.

154.    Defendant's conduct was not the result of legitimate business judgment or good faith contract enforcement, but rather a deliberate effort to secure leverage over Tatum and suppress his professional mobility using facially invalid contract provisions.

155.    As a direct and proximate result of Defendant's breach of the covenant of good faith and fair dealing, Tatum has suffered damages, including lost income, diminished professional opportunities, legal expenses, and emotional distress.

WHEREFORE, Plaintiff Tatum respectfully requests that this Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, costs, pre- and post-judgment interest, and any further relief this Court deems just and proper.

## FIFTH CLAIM FOR RELIEF
### (Violation of C.R.S. § 8-2-113 – Hermanowski v. Defendant)

156.    Hermanowski incorporates by reference the allegations set forth in Paragraphs 1 through 155 as if fully set forth herein.

157.    On August 10, 2022, amendments to C.R.S. § 8-2-113 took effect, substantially limiting the enforceability of noncompete and non-solicitation provisions in Colorado employment agreements.

158.    At the time of Hermanowski's termination on September 2, 2022, and at the time Defendant attempted to enforce the restrictive covenants (beginning in or around October 2022), Hermanowski did not qualify as a "highly compensated worker" under the thresholds set by the Colorado Department of Labor and Employment pursuant to C.R.S. § 8-2-113(2)(d).

159.    Additionally, the noncompete provision in the Hermanowski Employment Agreement was not reasonably limited in scope, geography, or duration.

160.    The restriction purported to bar Hermanowski from working in any capacity for any competitor of Defendant throughout the United States and Canada for two years.

161.    Defendant further failed to provide notice of the restrictive covenants in the form and manner required by § 8-2-113(4)(b), including any separate written notice at the time of the severance agreement, which reinforced the restrictive covenants set forth in the Hermanowski Employment Agreement.

162.    In or around October 2022, counsel for Defendant instructed Hermanowski to cease attempting to work with other companies based on the restrictive covenants, despite the covenants being facially unenforceable under both the amended and prior versions of C.R.S. § 8-2-113, as they were not reasonably limited in geographic scope, duration, or job function.

163.    Although Defendant did not initiate legal proceedings at the time, the communication from counsel conveyed an intent to enforce the restrictions, which had the effect of discouraging Hermanowski from pursuing lawful employment opportunities.

164.    Defendant's conduct constituted an unlawful attempt to enforce a void covenant, in violation of C.R.S. § 8-2-113(8)(a), as the covenant failed to satisfy statutory requirements and Hermanowski did not meet the compensation threshold for lawful enforcement.

165.    As a direct result of Defendant's unlawful conduct, Hermanowski suffered economic harm, lost employment opportunities, and incurred legal expenses.

166.    Pursuant to C.R.S. § 8-2-113(8)(b), Hermanowski is entitled to recover actual damages, reasonable attorneys' fees, and costs.

WHEREFORE, Plaintiff Hermanowski respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, statutory penalties, attorney's fees and costs, pre- and post-judgment interest, and any such other and further relief as the Court deems just and proper.

### SIXTH CLAIM FOR RELIEF
**(Breach of the Duty of Good Faith and Fair Dealing / Hermanowski v. Defendant)**

167.    Hermanowski incorporates by reference the allegations set forth in Paragraphs 1 through 166 as if fully set forth herein.

168.    The Hermanowski Employment Agreement provided for compensation including salary, vested equity (later revoked), and severance-related provisions.  It also contained restrictive covenants that purported to limit Hermanowski's post-employment activities.

169.    Defendant owed Hermanowski a duty of good faith and fair dealing in the performance and enforcement of the employment agreement, as well as in its post-employment dealings arising from that agreement.

170.    Hermanowski fulfilled his job responsibilities throughout his tenure and was never subject to any performance improvement plan.

171.    Defendant breached its duty of good faith and fair dealing by engaging in a course of conduct designed to deprive Hermanowski of the benefit of his employment relationship and future employment opportunities. This conduct included:

    a.  Terminating Hermanowski without prior warning and under vague, pretextual circumstances despite his strong performance record;

    b.  Presenting Hermanowski with a severance agreement under coercive time constraints and rejecting all proposed revisions;

    c.  Backdating the severance agreement to avoid continuation of Hermanowski's health insurance coverage;

    d.  Continuing to assert the enforceability of restrictive covenants that were void under Colorado law at the time of enforcement, including because Hermanowski did not meet the statutory compensation threshold and because the provisions were overbroad in scope and geography;

    e.  Interfering with Hermanowski's subsequent job prospects by threatening legal action against him and asserting post-employment restrictions to third parties; and

    f.  Forcing Hermanowski to incur legal expenses and to withdraw from viable employment opportunities as a result of these actions.

172.     Defendant's actions were commercially unreasonable and undertaken in bad faith, with the effect of depriving Hermanowski of compensation, career mobility, and the ability to work in his chosen profession.

173.     As a result, Hermanowski suffered financial loss, reputational harm, and significant emotional distress.

WHEREFORE, Plaintiff Hermanowski respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, pre- and post-judgment interest, costs, and any such other and further relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
### (Violation of C.R.S. § 8-2-113 – Torrison v. Defendant)

174.     Torrison incorporates by reference the allegations set forth in Paragraphs 1 through 173 as if fully set forth herein.

175.     On or after August 10, 2022, amendments to C.R.S. § 8-2-113 rendered noncompete and non-solicitation agreements presumptively void unless specific statutory conditions are met, including that the worker qualifies as a "highly compensated worker" at the time of enforcement.

176.     Torrison executed the Torrison Employment Agreement, which contained a non-competition provision restricting Torrison from competing with Defendant for one year following termination anywhere in the United States or Canada.

177.     Torrison was terminated by Defendant in April 2023.

178.    In or around November 2023, Defendant contacted Torrison's new employer and asserted that Torrison was subject to a restrictive covenant prohibiting him from working in the cannabis packaging industry due to his prior employment with Defendant.

179.    At the time of this enforcement attempt, Torrison's base salary was $80,000—substantially below the "highly compensated worker" threshold of $112,500 set by the Colorado Department of Labor and Employment for 2023.

180.    Defendant's act of communicating with Torrison's employer and asserting that he was contractually barred from working in his field constituted an unlawful attempt to enforce a void restrictive covenant, in violation of C.R.S. § 8-2-113(8)(a).

181.    As a direct result of Defendant's conduct, Torrison suffered actual damages, including loss of employment, diminished earning capacity, and interference with professional opportunities. Pursuant to C.R.S. § 8-2-113(8)(b), he is entitled to recover damages, attorneys' fees, and costs.

182.    In the alternative, even if the covenant Defendant attempted to enforce were facially valid under § 8-2-113(2), it was not reasonably limited in geographic scope, duration, or job function. The restriction purports to bar Torrison from working in any capacity for any competitor of Defendant throughout the United States and Canada for a period of one year.

183.    Such a restriction imposed an undue burden on Torrison's ability to earn a living and was not narrowly tailored to protect any legitimate business interest of Defendant.

WHEREFORE, Plaintiff Torrison respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial,

statutory penalties, attorney's fees and costs, pre- and post-judgment interest, and any such other and further relief as the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF
### (Tortious Interference with Contractual Relations – Torrison v. Defendant)

184.     Torrison incorporates by reference the allegations set forth in Paragraphs 1 through 183 as if fully set forth herein.

185.     In October 2023, Torrison entered into a valid and enforceable employment agreement with DIZPOT, a cannabis packaging company.  The agreement included a guaranteed base salary and commission structure.

186.     Defendant was aware of Torrison's employment with DIZPOT and his role within the company.

187.     On or about November 2023, Defendant contacted DIZPOT and asserted that Torrison was prohibited from working for DIZPOT due to a prior noncompete agreement, despite knowing or having reason to know that no such enforceable agreement existed.

188.     Upon receiving this communication, DIZPOT terminated Torrison's employment the same day.

189.     Defendant's actions were intentional and were undertaken to interfere with Torrison's employment relationship with DIZPOT.

190.     Although the Torrison Employment Agreement contained a noncompete provision, Defendant knew or should have known that the provision was void and unenforceable under Colorado law, because it was not reasonably limited in scope, duration, or job function, and because Torrison did not meet the statutory threshold to be classified as a highly compensated worker under C.R.S. § 8-2-113.

191.    As a direct result of Defendant's interference, Torrison suffered economic harm, including loss of income, commissions, benefits, and reputational damage.

WHEREFORE, Plaintiff Torrison respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, pre- and post-judgment interest, costs, and any such other and further relief as the Court deems just and proper.

## NINTH CLAIM FOR RELIEF
### (Breach of the Duty of Good Faith and Fair Dealing – Torrison v. Defendant)

192.    Torrison incorporates by reference the allegations set forth in Paragraphs 1 through 191 as if fully set forth herein.

193.    The Torrison Employment Agreement governed the terms of Torrison's employment, including his entitlement to compensation such as base salary, commissions, and accrued leave. The agreement also governed post-employment obligations, including provisions regarding confidentiality and restrictive covenants.

194.    As a matter of law, every contract includes an implied covenant of good faith and fair dealing, which prohibits a party from acting in a manner that prevents the other party from receiving the benefit of the bargain. Defendant owed Torrison such a duty in both the performance and enforcement of the Torrison Employment Agreement and in its related conduct during and following the employment relationship.

195.    Torrison fully performed his duties under the employment agreement. He met or exceeded the expectations of his role and was never subject to disciplinary or corrective action.

196.    Defendant breached the implied covenant of good faith and fair dealing by engaging in conduct intended to deprive Torrison of the benefits of his contractual relationship and to unfairly restrict his ability to earn a living after his termination.  Such conduct included:

a. Terminating Torrison shortly after he raised concerns about the Company's representations related to its products;

b. Presenting Torrison with a severance agreement under coercive conditions, including a limited time for review and without an opportunity to seek legal counsel, while misrepresenting his rights under Colorado law;

c. Continuing to assert the enforceability of a restrictive covenant that was void under C.R.S. § 8-2-113; and

d. Interfering with Torrison's prospective employment by representing to third parties, including his subsequent employer, that he remained bound by the covenant.

197.    Defendant's actions were not the result of good faith contractual enforcement, but instead reflected an effort to avoid obligations under the agreement and to suppress Torrison's post-employment mobility in violation of his contractual and statutory rights.

198.    As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Torrison has suffered damages including lost compensation, loss of professional standing, emotional distress, and diminished earning capacity.

WHEREFORE, Plaintiff Torrison respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, pre-

**EXHIBIT 2**

and post-judgment interest, costs, and any such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Docusign Envelope ID: C7AAA5CD-B931-4BEF-A18D-41A77DDAB47C

**EXHIBIT 2**

## <u>VERIFICATION</u>

     I, Michael Ryan Tatum, the undersigned, verify under the penalty of perjury, that the contents of this document are true and correct to the best of my knowledge.  I am over the age of 18 and I am competent to testify.

Dated this <u>20</u> day of June, 2025.



    Michael Ryan Tatum

     I, Simon Knobel, Chief Executive Officer of Calyx Containers, LLC, the undersigned, verify under the penalty of perjury, that the contents of this document are true and correct to the best of my knowledge.  I am over the age of 18 and I am competent to testify.

Dated this <u>20</u> day of June, 2025.

    Simon Knobel, CEO of Calyx Containers

     I, Chaz Hermanowski, the undersigned, verify under the penalty of perjury, that the contents of this document are true and correct to the best of my knowledge.  I am over the age of 18 and I am competent to testify.

Dated this <u>20</u> day of June, 2025.

    Chaz Hermanowski

Docusign Envelope ID: C7AAA5CD-B931-4BEF-A18D-41A77DDAB47C

## EXHIBIT 2

I, Jacob Torrison, the undersigned, verify under the penalty of perjury, that the contents of this document are true and correct to the best of my knowledge. I am over the age of 18 and I am competent to testify.

Dated this __20__ day of June, 2025.

Signed by:

*Jacob Torrison*

E1323DADE8FD4A8...

Jacob Torrison

**EXHIBIT 2**

DATED  this 20th day of June, 2025.

Respectfully submitted,

3i Law, LLC
*[A duly signed original on file at office of undersigned.]*

By: */s/ Jessamyn L. Jones*
Jessamyn L. Jones
Grant T. Shibao
2000 S. Colorado Blvd. Tower 1
Suite 10000
Denver, CO 80222
Telephone: (303) 245-2162
Facsimile: (303) 245-2108
jjones@3ilawfirm.com
gshibao@3ilawfirm.com

*Attorneys for Plaintiffs*

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833



## GROVE BAGS EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made and entered into as of February 1st,  2023, by and between **KINZIE ADVANCED POLYMERS LLC**, an Ohio limited liability company (dba Grove Bags), having a principal place of business at 26201 Richmond Rd Bedford Heights, OH 44146 (the "Company"), and Michael Tatum having an address at

5147 Chicory Circle Brighton, CO 80601
_____("Employee").

WHEREAS, the Company has created TerpLoc®, a cannabis film that is the first of its kind;

WHEREAS, the Company is a leader in the cannabis industry with valuable contacts with all levels of the supply chain from growers to retailers;

WHEREAS, as an employee of the Company, Employee will have access to the Company's various trade secrets and confidential information belonging to the Company and others;

WHEREAS, this Agreement is a condition of Employee's employment with the Company because this Agreement protects the Company's valuable confidential business information, trade secrets, employment relationships, and customer relationships;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto declare and agree as follows:

TATUM-0015

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**

Page 2 of 13                    Michael Tatum Employment

1. Employment. Continuing as of February 1st, 2023 (the "Commencement Date"), the Company agrees to, and does hereby, engage Employee and Employee hereby agrees to provide to the Company the Services (as hereinafter defined) upon the terms and conditions of this Agreement.

2. Term. This Agreement shall be effective as of the Commencement Date and continue for no definite term or tenure of employment, subject to the termination and notice requirements set forth in Paragraph 5 below (the "Employment Period"). The first three (3) consecutive months of the Employee's employment under this Agreement are agreed to constitute a period of probation during which the Company shall have the opportunity to assess the suitability of the Employee's performance and conduct (the "Probation Period"). At any time during the Probation Period, Company may terminate the Employee's employment, on the grounds of unsuitability, without providing any working notice or payment in lieu thereof.

3. Compensation. The Company shall pay Employee a base annual salary of $145,000.00 ("Compensation") to be paid in bi-monthly installments. Employee may receive bonus payments of up to $6,500 based on performance of each defined territory, as listed in Exhibit A. Employee receives a $1,000.00 bonus for each of the 6 territories that achieve their goal. An additional $500.00 bonus is available for the team achieving its total goal, regardless of which territories the revenue is generated from. Employee must be an active employee in good standing at time of bonus or commission disbursement to be eligible. Termination of employment by either party results in the employee forfeiting any claim to any and all future bonuses and commissions.

All compensation will be payable in installments in accordance with the Company's standard payroll practice. The Company may consider, in its sole discretion, whether to adjust the Employee's compensation from time to time. The Compensation will be paid to Employee less all applicable withholding of income taxes, social security taxes, or any other required deductions.

4. Position & Duties

TATUM-0016

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**
Page 3 of 13                      Michael Tatum Employment

(a) Position. Employee shall serve as the Chief Commercial Officer for Company.

(b) Duties. Employee shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the Position in which Employee serves hereunder and such other duties, responsibilities and obligations as the Company shall from time to time specify.

(c) Extent of Duties. Employee shall devote Employee's full business time to the duties required of Employee hereunder and shall use his or her best efforts, judgment, skill, and energy to perform such duties. Employee shall comply with all policies, practices, and procedures of the Company and that Company may elect to adopt from time-to-time, all of which shall remain subject to modification and/or termination at the Company's discretion. Employee agrees that Employee owes a duty of loyalty and good faith to the Company.

(d) Exclusive Employment. Employee shall not, without the prior written consent of the Company, directly or indirectly, during the term of this Agreement, other than in the performance of Employee's duties for the Company and in furtherance thereof, provide services to any person, firm or corporation, or entity, whether for compensation or otherwise.

(e)Kickback. Employee shall not receive any compensation from any vendors or customers while employed at Company. Violation this provision will result in immediate termination, return of compensation to Company, and any damages.

5. Termination.

(a) The Company or Employee may terminate the Agreement and the Employment Period by giving the other party written notice of such termination. The Employee is and shall remain an at-will Employee of the Company and nothing contained in this Agreement shall be deemed to create a principal/agent, partnership, or joint venture relationship between the parties. Upon termination of this Agreement, Employee shall only be

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

entitled to salary through the date of termination of this Agreement. No commission or other payments shall survive the termination of the Agreement.

(b) The termination of this Agreement and the Employment Period under any circumstances shall not be deemed to deprive the Company of any rights or release the Employee from any duties which were intended to survive the termination of the employment relationship including, without limitation, such rights and duties established under **Paragraph 6, Paragraph 7,** and **Paragraph 8** herein.

(c) Upon termination of this Agreement, Employee shall immediately discontinue any and all representations that he or she is an Employee of, or otherwise affiliated with, the Company. Employee shall submit all client lists and active accounts to the Company, and Employee acknowledges and agrees that all such client lists and active accounts belong to, and are the property of, the Company.

6. Restrictive Covenants.

(a) **Agreement Not To Directly Compete With The Company.** While employed by the Company and for a period of two (2) years immediately following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

(b) **Non-Solicitation of Customers And Other Third Parties.** While employed by the Company and for a period of two (2) years immediately

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, either directly or indirectly solicit, contact, induce, or attempt to induce the Company's current or prospective contractors, clients, customers, suppliers, vendors, licensees, licensors, franchisees, franchisors, or any persons or entities with business relations with the Company to cease doing business with the Company, or in any way interfere with the relationship between any such current or prospective contractors, clients, customers, suppliers, vendors, licensees, licensors, franchisees, franchisors, or business relation with the Company

(c) **Non-Solicitation of Employees.** While employed by the Company and for a period of two (2) years immediately following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, either directly or indirectly, induce or attempt to induce any employee of the Company to leave the employ of the Company, or in any way interfere with the relationship between the Company and any employee.

(d) **Non-Disparagement.**  Employee agrees and covenants that Employee will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company or its business, or any of its employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties.

(e) **Remedies for Breach of Restrictive Covenants.** Employee acknowledges that a breach of this Agreement may cause the Company continuing and irreparable injury which may not be adequately compensated through monetary damages. Employee therefore agrees that in the event of any actual or threatened breach of this Agreement, the Company will be entitled, in addition to any other remedies available to it, to immediate injunctive relief and may obtain a temporary restraining order and injunctive relief to prevent any violations of this Agreement.

 (f) **Recovery of Attorneys' Fees.**  In the event of litigation claiming breach of this Agreement by the Employee, the Company shall have the right to

TATUM-0019

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

recover from the Employee its attorneys' fees and costs incurred as a result of such litigation if the Employee is found to have violated this Agreement.

(g) **<u>Continuation of Restrictive Covenants.</u>** Employee's obligations under the Restrictive Covenants contained in this Paragraph 6, including its subparagraphs, are continuing in nature and are intended to survive the termination of this Agreement and Employee's employment with the Company.

7. Confidential Information.

(a) Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures, and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; and (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

(b) Employee agrees that the Confidential Information (a) shall be used by Employee solely for the performance of Employee's duties for the Company as directed by the Company from time to time; (b) is the sole and exclusive property of the Company (and Employee shall execute and deliver, at any time, such documents as the Company shall request in order to confirm the same); (c) is absolutely confidential to the Company; and (d) except as expressly permitted in writing by the Company, must not be disseminated, disclosed to others (including, without limitation, employees

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**

who do not have the Company's authorization to know any such Confidential Information), or used outside of the Company in any manner whatsoever. During the Employment Period, and in the event of the termination of this Agreement, whether voluntary or involuntary, Employee agrees not to use, disclose, transfer or exploit the Confidential Information at any time and in any manner whatsoever (other than using such Confidential Information for the Company's benefit and as expressly permitted by the Company during the Employment Period).

(c) Employee further agrees to immediately return all Company property and documents upon the termination of Employee's contractual relationship with the Company including, without limitation, all such Confidential Information. At all times, Employee agrees that Employee will not take or otherwise remove from the Company any of the Company's property and/or Confidential Information, without the express written consent of the Company.  Employee also agrees to provide the Company with all usernames and passwords for any and all computers, tablets, files, documents, websites, applications, software, or any other electronic or technical device, program, or file in which Employee used and/or created in connection with any duty Employee performed on behalf of the Company. This Section does not apply to any username or password which pertains solely to Employee's personal information or matters that do not involve the Company or its businesses or in any way violate any local, state, or federal law.

(d) Notwithstanding anything contained in this Agreement to the contrary, if Employee is requested or required (by oral questions or request for information or documents in court or administrative proceedings, interrogatories, subpoena, civil investigation, demand or similar court or administrative agency process) to disclose any Confidential Information, Employee will promptly notify the Company of such request or requirement prior to any disclosure of the Confidential Information so that the Company may seek an appropriate protective order and/or consider the possible waiver of Employee's compliance with this Agreement. However, if in the opinion of Employee's counsel, Employee is required by law or regulation

Case No. 1:23-cv-03221-DDD-CYC   Document 21   filed 04/25/25   USDC Colorado   pg 48 of 75

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**

to disclose the requested information prior to notice to the Company or prior to receipt of the Company's agreement of waiver, Employee may make such disclosure of such information (and only such information) without liability to the Company.

(e) Employee hereby acknowledges and agrees that the Company's remedy at law for any breach of any of Employee's obligations under this **Paragraph 7** would be inadequate, and Employee agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this **Paragraph 7** without the necessity of proof of actual damages, it being acknowledged by Employee that any such breach would cause irreparable injury to the Company.

(f) For purposes of this **Paragraph 7**, the term "Company" shall include the Company and all of its parents, subsidiaries, affiliates and related companies and/or entities.

8. Intellectual Property. Employee acknowledges and agrees that all Intellectual Property (hereinafter defined) developed by Employee, solely by Employee or jointly with others, during the Employment Period, whether or not during regular work hours, is a "work made for hire" to the greatest extent permitted by applicable law. Employee hereby assigns, conveys, and transfers to the Company, all of Employee's right, title, estate and interest which Employee has, or may have during the Employment Period, in and to the following:

Any and all intellectual and other intangible property including, without limitation, trade names, trademarks and service marks (whether registered or unregistered) and all registrations and applications therefor, mask works, websites, domain names, works of authorship and all copyrights related thereto, and all registrations and applications therefor, inventions, discoveries, developments, concepts, improvements, designs, industrial models (whether patentable or not), and all patent rights relating thereto and all applications therefor and all reissues, divisions, continuations and extensions thereof, know-how, trade secrets, processes, technology, discoveries, formulae and procedures, and software (collectively

TATUM-0022

Case No. 1:23-cv-01333-DDD-MDB   Document 21   filed 06/26/25   USDC Colorado
pg 49 of 75
DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**
Page 9 of 13                    Michael Tatum Employment

hereinafter referred to as "Intellectual Property"), together with the right to sue for infringement or improper, unlawful or unfair use or disclosure of any of the foregoing.

The assignment set forth in this **Paragraph 8** shall apply to Intellectual Property which meets any one of the following criteria: (a) results, at least in part, from Employee's use of time, equipment, supplies, facility, or trade secret information of the Company; (b) relates, at the time of conception or reduction to practice, directly or indirectly, (i) to the business, project or products of the Company, or the manufacture or utilization thereof, or (ii) to the Company's actual or anticipated research or development; and/or (c) results or arises, directly or indirectly, from any work performed or expected to be performed by Employee for the Company and is conceived or reduced to practice by Employee during or within two (2) years after termination of the Employment Period. The assignment set forth herein shall extend to all Intellectual Property resulting from information obtained by the Employee during the Employment Period, whether or not conceived or reduced to practice by Employee during or after termination of the Employment Period, except as explicitly set forth in this **Paragraph 8.**

9. Reasonableness of Restrictions and Assignment. Employee acknowledges that Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions and requirements set forth in this Agreement including, without limitation, the non-competition provisions set forth in **Paragraph 6**, the Confidential Information restrictions set forth in **Paragraph 7**, and the assignment of Intellectual Property set for in **Paragraph 8** herein, are fair and reasonable and are reasonably required for the protection of the interests of the Company and its officers, members, directors, shareholders and other employees.

10. Employee Benefits. Employee shall be eligible to participate in any benefit plan sponsored or maintained by the Company to the extent that the Company offers such plans and the Employee is eligible to participate under the terms thereof.

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

11. Expenses. The Company shall pay or reimburse Employee for out-of-pocket business expenses specific to the Employee's scope of work and sales efforts, in accordance with Company policy. To be eligible for reimbursement, an itemized documentation of expenses must be submitted monthly to the appropriate administrator.

12. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

13. Successor in Interest. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Company and the Company's successors and assigns including, without limitation, any successors in interest as a result of a merger, consolidation or change of name. This Agreement may not be assigned by Employee.

14. Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter gender.

16. Governing Law. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio. Any suit involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

17. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. Waiver. The failure of the Company at any time or from time to time to require performance of any of Employee's obligations under this Agreement shall in no manner affect the Company's rights to enforce any provision of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent or prior breach.

19. Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be personally delivered, sent by certified or registered mail, postage prepaid, return receipt requested, or by overnight delivery service and addressed as follows: if to the Company, to Kinzie Advanced Polymers LLC, Attention: Jacob Grover at 26201 Richmond Rd, Bedford Heights, OH 44146; if to the Employee, to Michael Tatum at

The parties hereto have executed this Agreement as of the day and year first above written.

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**

Company:

KINZIE ADVANCED POLYMERS LLC ,
an Ohio limited liability company, dba Grove Bags

By: Daniel Jaffe
Its: CFO

DocuSigned by:

*Dan Jaffe*

8F06C007B06B407...

Date: 2/3/2023


Employee:

Michael Tatum

DocuSigned by:

*Michael Ryan Tatum*

CF403C5D30EA482...

Date: 2/2/2023

TATUM-0026



# GROVE BAGS EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made and entered into as of January 1st, 2022 by and between **KINZIE ADVANCED POLYMERS LLC**, an Ohio limited liability company (dba Grove Bags), having a principal place of business at 1648 Clair St Ave NE Cleveland OH, 44114 (the "Company"), and Chaz Hermanowski having an address at
__8298 Bridle Path Boca Raton FL 33496_____("Employee").

WHEREAS, the financial and business acumen of Employee are valuable to the Company; and

WHEREAS, the Company desires to employ Employee under the terms and conditions set forth below, and Employee desires to accept such employment;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto declare and agree as follows:

1. Employment. Beginning as of January 1st, 2022 (the "Commencement Date"), the Company agrees to, and does hereby, engage Employee and Employee hereby agrees to provide to the Company the Services (as hereinafter defined) upon the terms and conditions of this Agreement.

2. Term. This Agreement shall be effective as of the Commencement Date and continue for no definite term or tenure of employment, subject to the termination and notice requirements set forth in Paragraph 5 below (the

Case No. 1:23-cv-01821-DDD-CYC Document 21 filed 06/26/25 USDC Colorado pg 54 of 75
DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

**EXHIBIT 2**
Page 2 of 12                    Hermanoski Employment

"Employment Period"). The first three (3) consecutive months of the Employee's employment under this Agreement are agreed to constitute a period of probation during which the Company shall have the opportunity to assess the suitability of the Employee's performance and conduct (the "Probation Period"). At any time during the Probation Period, Company may terminate the Employee's employment, on the grounds of unsuitability, without providing any working notice or payment in lieu thereof.

3. Compensation. The Company shall pay Employee a base annual salary of $90,000.00 ("Compensation") to be paid in bi-monthly installments. Employee may receive discretionary bonus payments based on performance, to be determined in Company's sole discretion. All compensation will be payable in installments in accordance with the Company's standard payroll practice. The Company may consider, in its sole discretion, whether to adjust the Employee's compensation from time to time. The Compensation will be paid to Employee less all applicable withholding of income taxes, social security taxes, or any other required deductions.

4. Position & Duties

(a) Position. Employee shall serve as the Director of Marketing for Company.

(b) Duties. Employee shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the Position in which Employee serves hereunder and such other duties, responsibilities and obligations as the Company shall from time to time specify.

(c) Extent of Duties. Employee shall devote Employee's full business time to the duties required of Employee hereunder and shall use his or her best efforts, judgment, skill, and energy to perform such duties. Employee shall comply with all policies, practices, and procedures of the Company and that Company may elect to adopt from time-to-time, all of which shall remain subject to modification and/or termination at the Company's discretion.

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

Employee agrees that Employee owes a duty of loyalty and good faith to the Company.

(d) Exclusive Employment. Employee shall not, without the prior written consent of the Company, directly or indirectly, during the term of this Agreement, other than in the performance of Employee's duties for the Company and in furtherance thereof, provide services to any person, firm or corporation, or entity, whether for compensation or otherwise.

(e)Kickback. Employee shall not receive any compensation from any vendors or customers while employed at Company. Violation this provision will result in immediate termination, return of compensation to Company, and any damages.

5. Termination.

(a) The Company or Employee may terminate the Agreement and the Employment Period by giving the other party written notice of such termination. The Employee is and shall remain an at-will Employee of the Company and nothing contained in this Agreement shall be deemed to create a principal/agent, partnership, or joint venture relationship between the parties.

(b) The termination of this Agreement and the Employment Period under any circumstances shall not be deemed to deprive the Company of any rights or release the Employee from any duties which were intended to survive the termination of the employment relationship including, without limitation, such rights and duties established under **Paragraph 6, Paragraph 7,** and **Paragraph 8** herein.

(c) Upon termination of this Agreement, Employee shall immediately discontinue any and all representations that he or she is an Employee of, or otherwise affiliated with, the Company. Employee shall submit all client lists and active accounts to the Company, and Employee acknowledges and agrees that all such client lists and active accounts belong to, and are the property of, the Company.

6. Restrictive Covenants.

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

**EXHIBIT 2**
Page 4 of 12                    Hermanoski Employment

(a) Non-Competition. Employee agrees that during Employee's employment with the Company and for two (2) years following the termination of Employee's employment  with the Company, for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

(b) Non-Solicitation of Customers. Employee agrees that during Employee's term of employment with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit, divert, take away, or attempt to divert or take away any: (a) customer or business of the Company or its affiliates; or (b) any potential customer or business of the Company or its affiliates that had been actively solicited by the Company or its affiliates at any time during Employee's employment with the Company.

(c) Non-Solicitation of Employees. Employee agrees that during Employee's term with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit any employee, partner, member, shareholder, agent, representative, or other person associated with the Company or its affiliates for the purpose of causing

CHAZ-0041

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

**EXHIBIT 2**

Page 5 of 12                              Hermanoski Employment

such person(s) to terminate such person(s) employment and/or association with the Company or its affiliates.

(d) Remedies for Breach of Restrictive Covenants. Employee acknowledges that a breach of this Agreement may cause the Company continuing and irreparable injury which may not be adequately compensated through monetary damages. Employee therefore agrees that in the event of any actual or threatened breach of this Agreement, the Company will be entitled, in addition to any other remedies available to it, to immediate injunctive relief and may obtain a temporary restraining order and injunctive relief to prevent any violations of this Agreement.

(e) Continuation of Restrictive Covenants. Employee's obligations under the Restrictive Covenants contained in this Paragraph 6, including its subparagraphs, are continuing in nature and are intended to survive the termination of this Agreement and Employee's employment with the Company.

7. Confidential Information.

(a) Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures, and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; and (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

CHAZ-0042

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

(b) Employee agrees that the Confidential Information (a) shall be used by Employee solely for the performance of Employee's duties for the Company as directed by the Company from time to time; (b) is the sole and exclusive property of the Company (and Employee shall execute and deliver, at any time, such documents as the Company shall request in order to confirm the same); (c) is absolutely confidential to the Company; and (d) except as expressly permitted in writing by the Company, must not be disseminated, disclosed to others (including, without limitation, employees who do not have the Company's authorization to know any such Confidential Information), or used outside of the Company in any manner whatsoever. During the Employment Period, and in the event of the termination of this Agreement, whether voluntary or involuntary, Employee agrees not to use, disclose, transfer or exploit the Confidential Information at any time and in any manner whatsoever (other than using such Confidential Information for the Company's benefit and as expressly permitted by the Company during the Employment Period). Employee further agrees to immediately return all Company property and documents upon the termination of Employee's contractual relationship with the Company including, without limitation, all such Confidential Information. At all times, Employee agrees that Employee will not take or otherwise remove from the Company any of the Company's property and/or Confidential Information, without the express written consent of the Company.

(c) Notwithstanding anything contained in this Agreement to the contrary, if Employee is requested or required (by oral questions or request for information or documents in court or administrative proceedings, interrogatories, subpoena, civil investigation, demand or similar court or administrative agency process) to disclose any Confidential Information, Employee will promptly notify the Company of such request or requirement prior to any disclosure of the Confidential Information so that the Company may seek an appropriate protective order and/or consider the possible waiver of Employee's compliance with this Agreement. However, if in the opinion of Employee's counsel, Employee is required by law or regulation to disclose the requested information prior to notice to the Company or prior to receipt of the Company's agreement of waiver, Employee may

CHAZ-0043

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

make such disclosure of such information (and only such information) without liability to the Company.

(d) Employee hereby acknowledges and agrees that the Company's remedy at law for any breach of any of Employee's obligations under this **Paragraph 7** would be inadequate, and Employee agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this **Paragraph 7** without the necessity of proof of actual damages, it being acknowledged by Employee that any such breach would cause irreparable injury to the Company.

(e) For purposes of this **Paragraph 7**, the term "Company" shall include the Company and all of its parents, subsidiaries, affiliates and related companies and/or entities.

8. Intellectual Property. Employee acknowledges and agrees that all Intellectual Property (hereinafter defined) developed by Employee, solely by Employee or jointly with others, during the Employment Period, whether or not during regular work hours, is a "work made for hire" to the greatest extent permitted by applicable law. Employee hereby assigns, conveys, and transfers to the Company, all of Employee's right, title, estate and interest which Employee has, or may have during the Employment Period, in and to the following:

Any and all intellectual and other intangible property including, without limitation, trade names, trademarks and service marks (whether registered or unregistered) and all registrations and applications therefor, mask works, websites, domain names, works of authorship and all copyrights related thereto, and all registrations and applications therefor, inventions, discoveries, developments, concepts, improvements, designs, industrial models (whether patentable or not), and all patent rights relating thereto and all applications therefor and all reissues, divisions, continuations and extensions thereof, know-how, trade secrets, processes, technology, discoveries, formulae and procedures, and software (collectively hereinafter referred to as "Intellectual Property"), together with the right to

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

**EXHIBIT 2**

Page 8 of 12                     Hermanoski Employment

sue for infringement or improper, unlawful or unfair use or disclosure of any of the foregoing.

The assignment set forth in this **Paragraph 8** shall apply to Intellectual Property which meets any one of the following criteria: (a) results, at least in part, from Employee's use of time, equipment, supplies, facility, or trade secret information of the Company; (b) relates, at the time of conception or reduction to practice, directly or indirectly, (i) to the business, project or products of the Company, or the manufacture or utilization thereof, or (ii) to the Company's actual or anticipated research or development; and/or (c) results or arises, directly or indirectly, from any work performed or expected to be performed by Employee for the Company and is conceived or reduced to practice by Employee during or within two (2) years after termination of the Employment Period. The assignment set forth herein shall extend to all Intellectual Property resulting from information obtained by the Employee during the Employment Period, whether or not conceived or reduced to practice by Employee during or after termination of the Employment Period, except as explicitly set forth in this **Paragraph 8.**

9. Reasonableness of Restrictions and Assignment. Employee acknowledges that Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions and requirements set forth in this Agreement including, without limitation, the non-competition provisions set forth in **Paragraph 6**, the Confidential Information restrictions set forth in **Paragraph 7**, and the assignment of Intellectual Property set for in **Paragraph 8** herein, are fair and reasonable and are reasonably required for the protection of the interests of the Company and its officers, members, directors, shareholders and other employees.

10. Employee Benefits. Employee shall be eligible to participate in any benefit plan sponsored or maintained by the Company to the extent that the Company offers such plans and the Employee is eligible to participate under the terms thereof.

11. Expenses. The Company shall pay or reimburse Employee for out-of-pocket business expenses specific to the Employee's scope of work and

CHAZ-0045

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

sales efforts, in accordance with Company policy. To be eligible for reimbursement, an itemized documentation of expenses must be submitted monthly to the appropriate administrator.

12. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

13. Successor in Interest. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Company and the Company's successors and assigns including, without limitation, any successors in interest as a result of a merger, consolidation or change of name. This Agreement may not be assigned by Employee.

14. Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter gender.

16. Governing Law. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio. Any suit

**EXHIBIT 2**

Page 10 of 12                              Hermanoski Employment

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

17. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. Waiver. The failure of the Company at any time or from time to time to require performance of any of Employee's obligations under this Agreement shall in no manner affect the Company's rights to enforce any provision of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent or prior breach.

19. Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be personally delivered, sent by certified or registered mail, postage prepaid, return receipt requested, or by overnight delivery service and addressed as follows: if to the Company, to Kinzie Advanced Polymers LLC, Attention: Jacob Grover at 1648 St Clair Ave. NE, Cleveland, OH 44114; if to the Employee, to Chaz Hermanowski at _____8298 Bridle Path Boca Raton FL 33496_____

**[SIGNATURE PAGE FOLLOWS]**

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

**EXHIBIT 2**

The parties hereto have executed this Agreement as of the day and year first above written.


Company:

KINZIE ADVANCED POLYMERS LLC ,
an Ohio limited liability company, dba Grove Bags

By: Daniel Jaffe
Its: Director of Finance and Human Resources

DocuSigned by:
*Dan Jaffe*
8F06C007B06B407...

Date: 1/10/2022


Employee:

Chaz Hermanowski

DocuSigned by:
*Chaz Hermanowski*
8CB40A4ADDAF4DB...

Date: 1/10/2022


CHAZ-0048

Case No. 1:25-cv-00321-DDD-CYC Document 21 filed 06/26/25 USDC Colorado pg 64 of 75
DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**
Page 1 of 12                    Torrison Employment



# GROVE BAGS EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made and entered into as of January 1st, 2022 by and between **KINZIE ADVANCED POLYMERS LLC**, an Ohio limited liability company (dba Grove Bags), having a principal place of business at 1648 Clair St Ave NE Cleveland OH, 44114 (the "Company"), and Jacob Torrison having an address at 4460 E 121st CT Thornton, CO 80241 _____("Employee").

WHEREAS, the skill and business acumen of Employee are valuable to the Company; and

WHEREAS, the Company desires to employ Employee under the terms and conditions set forth below, and Employee desires to accept such employment;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto declare and agree as follows:

1. Employment. Beginning as of January 1st, 2022 (the "Commencement Date"), the Company agrees to, and does hereby, engage Employee and Employee hereby agrees to provide to the Company the Services (as hereinafter defined) upon the terms and conditions of this Agreement.

2. Term. This Agreement shall be effective as of the Commencement Date and continue for no definite term or tenure of employment, subject to the termination and notice requirements set forth in Paragraph 5 below (the

Case No. 1:25-cv-01321-DDD-CYC   Document 21   filed 06/26/25   USDC Colorado
pg 65 of 75

"Employment Period"). The first three (3) consecutive months of the Employee's employment under this Agreement are agreed to constitute a period of probation during which the Company shall have the opportunity to assess the suitability of the Employee's performance and conduct (the "Probation Period"). At any time during the Probation Period, Company may terminate the Employee's employment, on the grounds of unsuitability, without providing any working notice or payment in lieu thereof.

3. Compensation. The Company shall pay Employee a base annual salary of $60,000.00 ("Compensation") to be paid in bi-monthly installments. All compensation will be payable in installments in accordance with the Company's standard payroll practice. Employee shall also receive a commission, calculated as percentage of revenue, for profitable sales from accounts made solely by Employee. The breakdown of commission is outlined in Exhibit A to this Agreement. The Company may consider, in its sole discretion, whether to adjust the Employee's compensation from time to time. The Compensation will be paid to Employee less all applicable withholding of income taxes, social security taxes, or any other required deductions.

4. Position & Duties

(a) Position. Employee shall serve as a Central Territory Sales Manager for Company with a goal of generating at least $800,000 in revenue.

(b) Duties. Employee shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the Position in which Employee serves hereunder and such other duties, responsibilities and obligations as the Company shall from time to time specify.

(c) Extent of Duties. Employee shall devote Employee's full business time to the duties required of Employee hereunder and shall use his or her best efforts, judgment, skill, and energy to perform such duties. Employee shall comply with all policies, practices, and procedures of the Company and that Company may elect to adopt from time-to-time, all of which shall remain subject to modification and/or termination at the Company's discretion.

TORRISON-0015

Case No. 1:25-cv-01321-CYD-CYC Document 21 filed 06/26/25 USDC Colorado pg 66 of 75
DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**
Page 3 of 12                    Torrison Employment

Employee agrees that Employee owes a duty of loyalty and good faith to the Company.

(d) Exclusive Employment. Employee shall not, without the prior written consent of the Company, directly or indirectly, during the term of this Agreement, other than in the performance of Employee's duties for the Company and in furtherance thereof, provide services to any person, firm or corporation, or entity, whether for compensation or otherwise.

(e)Kickback. Employee shall not receive any compensation from any vendors or customers while employed at Company. Violation this provision will result in immediate termination, return of compensation to Company, and any damages.

5. Termination.

(a) The Company or Employee may terminate the Agreement and the Employment Period by giving the other party written notice of such termination. The Employee is and shall remain an at-will Employee of the Company and nothing contained in this Agreement shall be deemed to create a principal/agent, partnership, or joint venture relationship between the parties.

(b) The termination of this Agreement and the Employment Period under any circumstances shall not be deemed to deprive the Company of any rights or release the Employee from any duties which were intended to survive the termination of the employment relationship including, without limitation, such rights and duties established under **Paragraph 6, Paragraph 7,** and **Paragraph 8** herein.

(c) Upon termination of this Agreement, Employee shall immediately discontinue any and all representations that he or she is an Employee of, or otherwise affiliated with, the Company. Employee shall submit all client lists and active accounts to the Company, and Employee acknowledges and agrees that all such client lists and active accounts belong to, and are the property of, the Company.

6. Restrictive Covenants.

**EXHIBIT 3**

(a) Non-Competition. Employee agrees that during Employee's employment with the Company and for one (1) year following the termination of Employee's employment  with the Company, for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

(b) Non-Solicitation of Customers. Employee agrees that during Employee's term of employment with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit, divert, take away, or attempt to divert or take away any: (a) customer or business of the Company or its affiliates; or (b) any potential customer or business of the Company or its affiliates that had been actively solicited by the Company or its affiliates at any time during Employee's employment with the Company.

(c) Non-Solicitation of Employees. Employee agrees that during Employee's term with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit any employee, partner, member, shareholder, agent, representative, or other person associated with the Company or its affiliates for the purpose of causing

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

such person(s) to terminate such person(s) employment and/or association with the Company or its affiliates.

(d) Remedies for Breach of Restrictive Covenants. Employee acknowledges that a breach of this Agreement may cause the Company continuing and irreparable injury which may not be adequately compensated through monetary damages. Employee therefore agrees that in the event of any actual or threatened breach of this Agreement, the Company will be entitled, in addition to any other remedies available to it, to immediate injunctive relief and may obtain a temporary restraining order and injunctive relief to prevent any violations of this Agreement.

(e) Continuation of Restrictive Covenants. Employee's obligations under the Restrictive Covenants contained in this Paragraph 6, including its subparagraphs, are continuing in nature and are intended to survive the termination of this Agreement and Employee's employment with the Company.

7. Confidential Information.

(a) Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures, and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; and (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

Case No. 1:23-cv-01233-DDD-CYC Document 21 filed 04/26/25 USDC Colorado pg 69 of 75
DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**
Page 6 of 12                    Torrison Employment

(b) Employee agrees that the Confidential Information (a) shall be used by Employee solely for the performance of Employee's duties for the Company as directed by the Company from time to time; (b) is the sole and exclusive property of the Company (and Employee shall execute and deliver, at any time, such documents as the Company shall request in order to confirm the same); (c) is absolutely confidential to the Company; and (d) except as expressly permitted in writing by the Company, must not be disseminated, disclosed to others (including, without limitation, employees who do not have the Company's authorization to know any such Confidential Information), or used outside of the Company in any manner whatsoever. During the Employment Period, and in the event of the termination of this Agreement, whether voluntary or involuntary, Employee agrees not to use, disclose, transfer or exploit the Confidential Information at any time and in any manner whatsoever (other than using such Confidential Information for the Company's benefit and as expressly permitted by the Company during the Employment Period). Employee further agrees to immediately return all Company property and documents upon the termination of Employee's contractual relationship with the Company including, without limitation, all such Confidential Information. At all times, Employee agrees that Employee will not take or otherwise remove from the Company any of the Company's property and/or Confidential Information, without the express written consent of the Company.

(c) Notwithstanding anything contained in this Agreement to the contrary, if Employee is requested or required (by oral questions or request for information or documents in court or administrative proceedings, interrogatories, subpoena, civil investigation, demand or similar court or administrative agency process) to disclose any Confidential Information, Employee will promptly notify the Company of such request or requirement prior to any disclosure of the Confidential Information so that the Company may seek an appropriate protective order and/or consider the possible waiver of Employee's compliance with this Agreement. However, if in the opinion of Employee's counsel, Employee is required by law or regulation to disclose the requested information prior to notice to the Company or prior to receipt of the Company's agreement of waiver, Employee may

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

make such disclosure of such information (and only such information) without liability to the Company.

(d) Employee hereby acknowledges and agrees that the Company's remedy at law for any breach of any of Employee's obligations under this **Paragraph 7** would be inadequate, and Employee agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this **Paragraph 7** without the necessity of proof of actual damages, it being acknowledged by Employee that any such breach would cause irreparable injury to the Company.

(e) For purposes of this **Paragraph 7**, the term "Company" shall include the Company and all of its parents, subsidiaries, affiliates and related companies and/or entities.

8. Intellectual Property. Employee acknowledges and agrees that all Intellectual Property (hereinafter defined) developed by Employee, solely by Employee or jointly with others, during the Employment Period, whether or not during regular work hours, is a "work made for hire" to the greatest extent permitted by applicable law. Employee hereby assigns, conveys, and transfers to the Company, all of Employee's right, title, estate and interest which Employee has, or may have during the Employment Period, in and to the following:

Any and all intellectual and other intangible property including, without limitation, trade names, trademarks and service marks (whether registered or unregistered) and all registrations and applications therefor, mask works, websites, domain names, works of authorship and all copyrights related thereto, and all registrations and applications therefor, inventions, discoveries, developments, concepts, improvements, designs, industrial models (whether patentable or not), and all patent rights relating thereto and all applications therefor and all reissues, divisions, continuations and extensions thereof, know-how, trade secrets, processes, technology, discoveries, formulae and procedures, and software (collectively hereinafter referred to as "Intellectual Property"), together with the right to

Case No. 1:23-cv-01333-DDD-MDB Document 21-9 filed 06/26/25 USDC Colorado pg 71 of 75
DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**
Page 8 of 12                    Torrison Employment

sue for infringement or improper, unlawful or unfair use or disclosure of any of the foregoing.

The assignment set forth in this **Paragraph 8** shall apply to Intellectual Property which meets any one of the following criteria: (a) results, at least in part, from Employee's use of time, equipment, supplies, facility, or trade secret information of the Company; (b) relates, at the time of conception or reduction to practice, directly or indirectly, (i) to the business, project or products of the Company, or the manufacture or utilization thereof, or (ii) to the Company's actual or anticipated research or development; and/or (c) results or arises, directly or indirectly, from any work performed or expected to be performed by Employee for the Company and is conceived or reduced to practice by Employee during or within two (2) years after termination of the Employment Period. The assignment set forth herein shall extend to all Intellectual Property resulting from information obtained by the Employee during the Employment Period, whether or not conceived or reduced to practice by Employee during or after termination of the Employment Period, except as explicitly set forth in this **Paragraph 8.**

9. Reasonableness of Restrictions and Assignment. Employee acknowledges that Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions and requirements set forth in this Agreement including, without limitation, the non-competition provisions set forth in **Paragraph 6**, the Confidential Information restrictions set forth in **Paragraph 7**, and the assignment of Intellectual Property set for in **Paragraph 8** herein, are fair and reasonable and are reasonably required for the protection of the interests of the Company and its officers, members, directors, shareholders and other employees.

10. Employee Benefits. Employee shall be eligible to participate in any benefit plan sponsored or maintained by the Company to the extent that the Company offers such plans and the Employee is eligible to participate under the terms thereof.

11. Expenses. The Company shall pay or reimburse Employee for out-of-pocket business expenses specific to the Employee's scope of work and

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

sales efforts, in accordance with Company policy. To be eligible for reimbursement, an itemized documentation of expenses must be submitted monthly to the appropriate administrator.

12. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

13. Successor in Interest. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Company and the Company's successors and assigns including, without limitation, any successors in interest as a result of a merger, consolidation or change of name. This Agreement may not be assigned by Employee.

14. Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter gender.

16. Governing Law. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio. Any suit

TORRISON-0022

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

17. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. Waiver. The failure of the Company at any time or from time to time to require performance of any of Employee's obligations under this Agreement shall in no manner affect the Company's rights to enforce any provision of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent or prior breach.

19. Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be personally delivered, sent by certified or registered mail, postage prepaid, return receipt requested, or by overnight delivery service and addressed as follows: if to the Company, to Kinzie Advanced Polymers LLC, Attention: Jacob Grover at 1648 St Clair Ave. NE, Cleveland, OH 44114; if to the Employee, to Jacob Torrison at 4460 E 121st CT Thornton, CO 80241

_____

**[SIGNATURE PAGE FOLLOWS]**

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**

The parties hereto have executed this Agreement as of the day and year first above written.


Company:

KINZIE ADVANCED POLYMERS LLC ,
an Ohio limited liability company, dba Grove Bags

By: Daniel Jaffe
Its: Director of Finance & HR

*Dan Jaffe*
—8F06C007B06B407...

Date: 1/10/2022


Employee:

Jacob Torrison

*Jacob Torrison*
—83B903C9530B497...

Date: 1/10/2022


TORRISON-0024

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

## EXHIBIT A

| Commission Granted as a % of Revenue | Realized GP% for Project |
|---|---|
| 5% | >41% |
| 4% | 40%-31% |
| 3% | <30% |

TORRISON-0025